UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                  :
LEE MOORE,              :
ADMINISTRATOR OF THE    :
ESTATE OF DANIEL E. WEAVER  :        3:17 CV 1126 (RMS)
                  :
V.                  :
                  :
NANCY A. BERRYHILL,     :
ACTING COMMISSIONER OF   :
SOCIAL SECURITY[1]      :      DATE: SEPTEMBER 26, 2018
                  :
------------------------------------------------------- x

**RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff Disability Insurance benefits ["DIB"].

I.    ADMINISTRATIVE PROCEEDINGS

On or about December 2, 2013, the plaintiff[2] filed an application for DIB benefits claiming he has been disabled since December 1, 2012, due to bipolar disorder and attention deficit, hyperactivity disorder ["ADHD"]. (Certified Transcript of Administrative Proceedings, dated August 3, 2017 ["Tr."] 198-201). The plaintiff subsequently amended his onset date of disability to January 1, 2014. (Tr. 217). The plaintiff's application was denied initially (Tr. 133-36) and upon

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

[2] On April 9, 2018, Daniel Weaver passed away. (*See* Doc. No. 31). Six days ago, on September 19, 2018, Lee Moore, the Administrator of Daniel Weaver's estate, was substituted as the plaintiff in this action (*see* Doc. Nos. 25-26, 31-32, 33), but "the plaintiff" as referred to herein, refers to the claimant, Daniel Weaver.

reconsideration. (Tr. 141-49). On August 15, 2014, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 150-51), and on September 14, 2015, a hearing was held before ALJ Eskunder Boyd, at which the plaintiff and a vocational expert testified. (Tr. 63-95; *see* Tr. 164-88). On October 27, 2015, ALJ Boyd issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 42-62). On December 23, 2015, the plaintiff filed a request for review of the hearing decision (Tr. 197), and on May 4, 2017, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-7).

On July 7, 2017, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on September 11, 2017, the defendant filed her answer and administrative transcript, dated August 3, 2017. (Doc. No. 14). On September 29, 2017, the parties consented to the jurisdiction of a United States Magistrate Judge; the case was transferred to Magistrate Judge Joan G. Margolis. (Doc. No. 18). On December 13, 2017, the parties filed a Joint Stipulation of Facts (Doc. No. 21),[3] and the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 22), and brief in support. (Doc. No. 21-1 ["Pl.'s Mem."]). On February 13, 2018, the defendant filed her Motion to Affirm (Doc. No. 23), and brief in support. (Doc. No. 23-1 ["Def.'s Mem."]). On May 1, 2018, this case was reassigned to this Magistrate Judge. (Doc. No. 24).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 22) is *denied*, and the defendant's Motion to Affirm (Doc. No. 23) is *granted.*

---

[3] Although the parties filed a Joint Stipulation of Facts (Doc. No. 21), the briefs contained voluminous additional recitations of facts, rendering the Joint Stipulation unhelpful to the Court.

## II. FACTUAL BACKGROUND

### A. HEARING TESTIMONY

As of the date of his hearing in 2015, the plaintiff was fifty-eight years old, living with his husband in a "historical house museum." (Tr. 69-70). He testified that he could groom and bathe himself, do yard work and laundry, and take out the trash, though he sometimes lacked motivation. (Tr. 73). Additionally, he would run three to four miles a day. (Tr. 73). He said he spent a lot of time watching television (Tr. 77) and checked his emails once a day. (Tr. 79).

According to the plaintiff, he was disabled due to depression, ADHD, borderline personality disorder, and post-traumatic stress syndrome, which resulted in anxiety and panic attacks. (Tr. 74, 81). He testified that he got along with people, but had trouble concentrating. (Tr. 77, 79). He had suicidal thoughts "almost daily" and, indeed, felt suicidal during the week of the hearing. (Tr. 80). He said he did not want to go to the hospital because he was "starting a volunteer program for hospice" the next day and had a per diem job lined up later in the week that he wanted to keep. (Tr. 80).

The plaintiff held a bachelor's degree in communications, and at the time of the hearing, was working per diem as a recreation therapy aide. (Tr. 70-71). He served as a paid intern at the Residence House in 2013, and at the same time, he went back to school to earn a certificate in recreation therapy. (Tr. 82). However, the internship and the schooling proved "too much for [him][]" in terms of his ability to concentrate and deal with the behaviors of the people around him. (Tr. 83). At his hearing, the plaintiff's counsel explained that he amended the onset date of disability to January 1, 2014 in light of the plaintiff's "significant employment" in 2013. (Tr. 68-69). Prior to performing his work in 2013, he was self-employed as a video producer. (Tr. 72,

84).  The plaintiff worked at Foxwoods Casino from 2002-2010, first as a video producer, and then as the director of communications. (Tr. 84-85). He was "over [his] head[]" in the director's position so he decided that "maybe it was time for [him] to get out o[f] corporate work and . . . start to try to do something with [his] business." (Tr. 85).  At that time, he started having "social issues where [he] was uncomfortable around a lot of people." (Tr. 85). From 2001-2002, he was a supervising producer at True Entertainment Television; he won an Emmy when working in that capacity.  (Tr. 85-86).

A vocational expert testified at the plaintiff's hearing that the job the plaintiff was then-currently performing as a recreation aid was light, unskilled work. (Tr. 89).  She testified that an individual who could perform simple and detailed tasks, with sustained concentration, pace and persistence for three-to-four hour segments, with occasional interaction with coworkers and brief superficial interaction with the public, could perform the work of an office cleaner, laundry worker, and hand packer.  (Tr. 90).  Additionally, if the individual was (1) unable to perform work requiring a specific production rate; (2) limited to performing simple, routine, repetitive tasks, with sustained concentration, pace and persistence for two hour segments, with occasional interaction with coworkers, but no interaction with the public; and (3) restricted to not making anything more than simple, work-related judgments, such individual could perform the work of a laundry worker and a housekeeper, but not a hand packer.  (Tr. 91).  The vocational expert also acknowledged that, if the individual could not sustain concentration, pace and persistence for two-hour segments, the individual could not work.  (Tr. 91-92).   Similarly, if someone was absent three times a month, it would be "unlikely" that he or she could maintain employment.  (Tr. 92).

B.    MEDICAL HISTORY

As discussed above, the plaintiff's amended onset date of disability is January 1, 2014. (Tr. 217). There are scores of medical records pre-dating this onset date which this Court has reviewed. (*See* Tr. 333-56 (treatment at Select Behavioral Health from May 3, 2008 to June 23, 2012);[4] Tr. 357-59, 495-96, 579-80 (July 9, 2012 MRI of the brain showing abnormal findings and "[s]mall foci of white matter disease[]"); Tr. 486-87, 593-94 (May 2011 new patient record with Dr. Anandhi Pathman at the Community Health Center ["CHC"] noting, "Moderate Depression"); Tr. 482-83, 587-88 (April 2012 referral from Dr. Pathman to Behavioral Health for "Mild Depression[]"); Tr. 474-75, 583-84 (2012 records from Ngozi Mewe-Pirn, APRN regarding fainting/dizziness); Tr. 360-75, 464-65, 471-72, 490-91, 570-78, 581-82, 585-86 (2012 records from Dr. Pathman regarding fainting/dizziness); Tr. 480-81, 484-85, 589-90 (February and May 2012 treatment record from Dr. Pathman for medication management for hypertension, hyperlipidemia, and bipolar disorder); Tr. 376-414, 417-25, 428-30, 433-42, 444-53, 456-63, 466-70, 473, 476-79, 506-10, 514-16, 519-20, 523-27, 529-40, 617-20, 720-21, 724, 727, 769-70, 77, 778-79, 782-83, 786-89, 793-94, 797, 820 (May 2012-October 2013 bi-weekly treatment records from Janet Noyes, LMFT, Community Health Center for bipolar disorder, PTSD and ADHD); Tr. 415-16, 431-32, 443, 511-12, 517-18, 521-22, 528, 541-42, 621-22, 722-23, 725-26, 771-72, 775-76, 780-81, 784-85, 791-92, 795-96 (December 2012 and February, April, May, June, July, September and October 2013 treatment records from Dr. Victor Tirado-Montanez at CHC for bipolar disorder, PTSD and ADHD); Tr. 426-27, 560, 567-69, 774, 777, 790, 909 (February, June September, and October 2013 treatment records from Dr. Anandhi Baleswaren[5] for blood pressure

---

[4] The plaintiff was examined by Dr. Christopher C. Tolsdorf, a neuropsychologist, for an assessment in December 2009; Dr. Tolsdorf opined that the plaintiff had been promoted to a job for which he was not "well-suited[,]" and he suggested that the plaintiff "develop a career goal of eventually finding a position that provides a better fit[.]" (Tr. 334; *see* Tr. 333-35, 625-26). Dr. Tolsdorf expected that such a change would "improve [the plaintiff's] clinical presentation significantly." (Tr. 334).

[5] Dr. Baleswaren is formerly known as Dr. Pathman.

checks)).[6] As required, the Court will focus on the relevant period at issue and the records related to that time period.

On September 26, 2013, Dr. Baleswaren, the plaintiff's primary care provider at CHC, completed a Medical Report for DDS in which she opined as to the plaintiff's physical limitations, but noted that a "mental health provider" will complete the mental health portion of the form; that portion, however, is not attached. (Tr. 552-59, 597-604, 634-42). Dr. Baleswaren indicated that the plaintiff's mental health had recently declined, but that he was not prevented from working at that time. (Tr. 552, 597, 634). On November 14, 2013, the plaintiff's therapist at CHC since 2012, Janet (also referred to as Jana in the record) Noyes, LMFT, and his psychologist, Dr. Victor Tirado-Montanez, completed the same Medical Report. (Tr. 607-14). In their report, they noted that the plaintiff had been working part-time but that, since he started his internship through the Bureau of Rehabilitation Services ["BRS"], his "symptoms of anxiety and depression have exacerbated to the point of feeling unable to function and wanting to sleep all the time." (Tr. 607). They reported that the plaintiff experienced "severe depressive episodes with suicidal ideation, weight loss, insomnia, depressed mood, fatigue, loss of energy, feelings of despair, hopelessness, worthlessness, [and] diminished ability to think/concentrate." (Tr. 610). They opined that he was moderately limited in his ability to remember locations and work-like procedures; understand and remember very short, simple instructions; understand, remember and carry out detailed instructions; respond appropriately to changes in a work setting; be aware of normal hazards; and, set realistic goals or make plans independently. (Tr. 611-12). Additionally, they opined that the

---

[6] The record also reflects that the plaintiff had a bilateral hearing impairment, for which he was prescribed hearing aids. (Tr. 498-99, 543-44, 561-62, 828-29, 1029-37 (more substantial impairment in right ear); *see also* Tr. 500-03, 545-48, 563-66, 623-24, 821-35, 1006-11). In addition, there are records from a 2012 diagnosis of obstructive sleep apnea, periodic limb movement sleep disorder and restless legs disorder (Tr. 504-05, 591-92), as well as a 2015 sleep study (Tr. 1019-22, 1213-15; *see also* Tr. 1096-97 (referral)).

plaintiff was markedly limited in his ability to maintain attention and concentration; perform activities within a schedule; sustain an ordinary routine; work in coordination with others without being distracted; and, complete a normal workday or workweek. (Tr. 611).

Consistent with his treatment history at CHC, and to address his depression and anxiety, from November 2013 to August 2015, the plaintiff regularly met with Noyes. On November 7, 2013, the plaintiff reported to Noyes that he was "not doing well, fearful; feeling a sense of impending doom; fear of everything; working, responsibility, everything." (Tr. 719, 768). Similarly, he reported to Dr. Baleswaren that he felt "hopeless." (Tr. 766-67, 907-08). On November 14, 2013, the plaintiff told Dr. Baleswaren that he would be in need of health insurance and was thinking about quitting his job on November 29, 2013 and applying for Social Security Disability. (Tr. 715-16, 762-63).[7]

On November 14, 2013, the plaintiff also saw Noyes, who noted a "pale, dead expression in eyes, tearful, limp posture, low energy[, and] [a]nhedonia." (Tr. 717-18, 764-65). On November 19, 2013, the plaintiff reported suicidal ideation without plan or intent; Noyes noted that the plaintiff "seems unable to continue working." (Tr. 713-14, 760-61). The next day, the plaintiff returned to Noyes reporting "vague, pervasive anxiety, but cannot specify, just reports he lacks confidence." (Tr. 712, 759). On November 21, 2013, he reported to Noyes that he was in a "dark place[,]" but Noyes found his judgment minimally impaired, his insight moderately impaired, and that he had no suicidal ideation. (Tr. 711). Noyes saw the plaintiff on December 2, 5, 9, 13 and 17, 2013; he had no suicidal ideation, minimal impairment in judgment, and moderate impairment in his insight. (Tr. 697-98, 705-06, 742, 749-50, 753-55). On December 5, 2013, Dr.

---

[7] Similarly, at his appointments with Dr. Baleswaren on November 21 and December 2, 2013, the plaintiff reported that he was in need of insurance because his coverage terminated at the end of November 2013, and he was "quitting his full time job and would like to explore applying for Social Security Disability." (Tr. 707-10, 752-57).

Baleswaren noted that the plaintiff quit his job as he could "not complete the tasks at work." (Tr. 751-52, 905-06). Seven days later, on December 12, 2013, Dr. Tirado-Montanez noted that the plaintiff had "chronic stressors but [he] seem[ed] to be coping." (Tr. 743).

On December 11, 2013, Noyes and Dr. Tirado completed another assessment of the plaintiff in connection with his application for benefits in which they reported that the plaintiff has suffered from major depression for 25 years and bipolar disorder for 13 years. (Tr. 627). The plaintiff had a disheveled appearance, short-term memory loss, difficult concentrating, a depressive, anxious and constricted mood, and mild-to-moderate judgment. (Tr. 627-28). They rated the plaintiff as having an "[o]bvious [p]roblem" taking care of his personal hygiene, caring for his physical needs, interacting appropriately with others, carrying out single-step instructions, and changing from one simple task to another; he was having a "[s]erious [p]roblem" handling frustration and carrying out multi-step instructions; and, a "[v]ery [s]erious [p]roblem" using appropriate coping skills to meet the ordinary demands of work, focusing long enough to finish assigned simple activities, performing basic work activities at a reasonable pace, and performing work on a sustained basis. (Tr. 628-29). They commented that the plaintiff was having frequent suicidal ideation, a sense of feeling overwhelmed "(anxiety) and despair (depression)[,]" with "[e]pisodes of depression alternating with hypomania [and] memory loss." (Tr. 628).[8]

---

[8] On February 5, 2014, the plaintiff was seen by Dr. Laurence Radin of the Neurological Group, P.C. for decreased memory and forgetfulness. (Tr. 892, 1018). On March 6, 2014, the plaintiff was seen for a follow-up with Dr. Radin for complaints of memory dysfunction and forgetfulness. (Tr. 497, 890, 899, 1014). Dr. Radin noted that the 2012 MRI results were "essentially normal[]"; he started the plaintiff on B12 supplements for fatigue. (Tr. 497, 890, 899, 1014). On July 17, 2014, Dr. Radin saw the plaintiff regarding his B12 levels. (Tr. 972, 1012-1013; *see also* Tr. 948-53 958-68, 1094-95, 1099-1100, 1104-07 (B12 injections given at CHC)). He was seen again on November 12, 2014, at which point his B12 levels were in the normal range. (Tr. 1027-28, 1103). On December 22, 2014, Dr. Radin started the plaintiff on CoQ10 and a B complex supplement for his fatigue. (Tr. 1098). The plaintiff saw Dr. Baleswaren in September and November 2014, and March, June, July and August 2015, for complaints of feeling tired and fatigued. (Tr. 1092-93, 1101-02, 1108-09, 1221-28).

On the same day, Noyes and Dr. Baleswaren saw the plaintiff because he claimed to be experiencing dementia. (Tr. 702-03, 746-48, 904). The next day, on December 12, 2013, Dr. Baleswaren again saw the plaintiff, who reiterated that he was "quitting his full job and would like to explore applying for Social Security Disability." (Tr. 700-01, 707-08, 744-45). He also noted that "he may be open to part-time employment and is not fully committed to the idea of applying for permanent disability." (Tr. 700, 707). He planned to explore unemployment benefits as well. (Tr. 701). The plaintiff also saw Dr. Tirado-Montanez for medication management; he reported "increased anxiety associated with poor sleep[]" and "[d]escribed increased financial stress." (Tr. 699).

On December 17, 2013, he returned to Noyes; he had minimal impairment in his judgment, moderate impairment in his insight, and no suicidal ideation. (Tr. 741). On December 18, 2013, Dr. Tirado-Montanez and Noyes submitted an identical medical report to the one submitted on December 11, 2013 in connection with his application for benefits, but in the December 18 version, they added that the plaintiff was hospitalized on two occasions for severe major depression.[9] (Tr. 649; *see* Tr. 643-50). The next day, on December 19, 2013, the plaintiff reported to Noyes that he was feeling "worse, overwhelmed, tired." (Tr. 696, 740). On December 27, 2013, he told Dr. Baleswaren that "he wanted to sleep all the time," felt lethargic, and had nausea with panic attacks. (Tr. 733-37, 900-01).

The plaintiff was admitted to the Pond House at Lawrence & Memorial Hospital from December 28, 2013 to January 6, 2014 for "safety and stabilization[]" after presenting in the emergency room on December 27, 2013 (Tr. 660-71) with "long-terms feelings of suicide as well as feeling somewhat depressed[.]" (Tr. 653; *see* Tr. 651-91). The plaintiff reported that he was

---

[9] The hospitalizations referred to in this report were December 26, 2013 through January 6, 2014, and January 27, 2013 to "present[.]" (Tr. 649). Noyes initialed these entries on "2/3/2014[.]" (Tr. 649).

having financial problems and "started to feel that his career is not very fulfilling and not very worthwhile." (Tr. 655, 665). He was discharged with a diagnosis of major depression, single episode, in remission, and a GAF score of 60. (Tr. 654). The plaintiff returned to Noyes the day of his discharge. (Tr. 737).

The day after his discharge, Dr. Tirado-Montanez saw the plaintiff for medication management and noted that the plaintiff had been admitted "due to mood decompensation in the context of limited financial limitations." (Tr. 693-94, 735-36). On January 8, 2014, Dr. Baleswaren rated the plaintiff's depression as "[s]evere." (Tr. 897-98). On January 16, 2014, the plaintiff returned to Noyes who found his judgment and insight to be moderately impaired. (Tr. 692, 730-31). He saw her again on January 21, for a family therapy visit (Tr. 944), and on January 23, 2014, at which time he was referred to Backus "PHP [Partial Hospitalization Program] for two to four weeks." (Tr. 728-29, 942-43).

Upon intake at the PHP, the plaintiff reported that he could not remember a time when he had not felt depressed in his life; the intake counselor noted that "the patient ha[d] been very successful in the past in his work life. . . . He [did] not feel that he [was] capable of meeting the expectations of his new role [as the tour guide of his historic home when his spouse starts his new job] . . . and he was very focused on [that] for a good part of his treatment[]" which ran from January 27 to March 11, 2014. (Tr. 801, 836, 856, 893; *see* Tr. 801-20, 836-77, 893-96; *see also* Tr. 802, 837, 857, 894 (reporting that "this new job [as a tour guide] should give him a sense of purpose, but it [did] not, and he [was] exploring options for other careers that might give him more of a sense of purpose.")). Upon admission, the plaintiff rated his depression and anxiety as a nine on a scale to ten; he had a ten pound weight loss in the past two months; and his concentration and attention were poor. (Tr. 818, 853, 872). The plaintiff reported that he was employed at Reliance

House for three months and left the job in November 2013 which he felt was a "mistake[.]" (Tr. 818, 853, 872). He was attending school while working and "this was too much for him to handle," and he "'deeply regret[ed]' leaving" that job. (Tr. 818, 853, 872). Treatment notes reflect improvement over the course of the program. (Tr. 803, 838, 858 (felt "significant improvement from the time that he had started the program[]"), 807, 842, 862 (noting the plaintiff was neatly groomed, bright, articulate, and "showing significant increase in spontaneity[]")).[10]

On March 13, 2014, the plaintiff returned to treatment with Dr. Tirado-Montanez; he reported episodes of anxiety and rumination; the mental status exam revealed an anxious mood, appropriate affect, normal speech, and circumstantial thought process. (Tr. 940-41). When he returned to Noyes on March 18, 2014, he was smiling and appeared more comfortable and relaxed. (Tr. 938-39). On April 1, 2014, the plaintiff told Noyes that he was looking into Massage Therapy school; he was bowling and walking for recreation, and he was smiling and had a neat appearance. (Tr. 936-37). Noyes's notes reflect the same positive improvement on April 10, 2014 and May 1, 2014, as well as the plaintiff's report that he was "[l]ooking forward to working outside of [his] home" and he was planning to volunteer at hospice. (Tr. 930-31, 934-35). On April 22, 2014, the plaintiff reported to Dr. Tirado-Montanez that he experienced ruminations at bedtime, but that his depression improved; he "continue[d] to be fragile with a low tolerance to stress." (Tr. 932-33). A month later, the plaintiff reported that the sedation he was experiencing with Seroquel improved with a decreased dose. (Tr. 928). On May 23 and 28, 2014, Noyes noted that the plaintiff felt lonely, but that he had "moderate[]" progress towards treatment. (Tr. 924-27; *see also* Tr. 922-23

---

[10] In May, June, August 2014, the plaintiff was seen by Lisa Kaplan, APRN at Community Health Center to monitor his blood pressure (Tr. 878-82, 946-47), and for unrelated general medical complaints. (Tr. 883-86; *see also* Tr. 954-57, 970-71, 1220 (right foot issues)). The plaintiff saw Dr. Baleswaren for his blood pressure in March and July 2014. (Tr. 887-88, 974-75). In September and November 2014, and March, June, July and August 2015, he reported feeling tired and fatigued. (Tr. 1092-93, 1101-02, 1108-09, 1221-28).

(participation in group therapy)).  On June 4, 2014, the plaintiff told Noyes that he was considering continuing school and internship placements.  (Tr. 920-21).  Six days later, he expressed "excessive[]" worry (Tr. 918-19), and on June 12, 2014, Noyes noted that he was in work-out clothes, and the plaintiff reported that he was jogging, walking and doing yoga.  (Tr. 916-17).  On June 18, 2014, Noyes noted that the plaintiff was planning on an internship at Apple Rehab, two days a week, plus taking a class, and two more classes in the Spring. (Tr. 914-15).  The plaintiff was thinking about it to "make sure he want[ed] to do [that]."  (Tr. 914).[11]

On June 30, 2014, Noyes completed another assessment of the plaintiff in connection with his application for benefits; Dr. Tirado-Montanez co-signed this assessment on July 1, 2014.  (Tr. 1048-51).  Noyes found "[s]light [i]mprovement" in the plaintiff's condition while noting the exacerbation of symptoms in the "winter 2013-14[.]" (Tr. 1048). According to Noyes, the plaintiff had difficulty focusing and concentrating even with ADHD medications, and he had memory issues that "seem related to anxiety and [ADHD]."  (Tr. 1048).  At that point, his speech was normal, although she noted it was "pressured at times over this past year[.]" (Tr. 1049).  She opined that he had a "mild impairment at present" and "[had] been mild-moderately impaired at times over this past year."  (Tr. 1049).  She noted continuing suicidal ideation, "sense of overwhelm and anxiety. Sense of despair has lessened since PHP treatment. Depression continues. Client tends to ruminate over stressors. Depression and anxiety lead to feelings of hopelessness [and] worthlessness."  (Tr. 1049).  She rated him as having a "[s]erious [p]roblem" using appropriate coping skills, handling frustration appropriately, carrying out multi-step instructions, and focusing long enough to finish assigned simple tasks.  (Tr. 1049-50).  She rated him as having a "[s]erious"

---

[11] The plaintiff was seen at Comprehensive Psychiatric Care, P.C. on June 25, 2014 for depression.  (Tr. 1042-47).

to "[v]ery [s]erious" problem performing basic work activities, and as having a "[s]erious [p]roblem" performing work activity on a sustained basis. (Tr. 1050).

The plaintiff continued to see Noyes weekly from June 2014 through September 2014, discussing his confidence, stress level, worry, and his childhood. (Tr. 910-13, 978-79, 982-83, 988-89, 990-91, 998-99, 1000-01 (running cross country for stress relief), 1002-05, 1086-91). In late July, late August and early September, the plaintiff reported to Noyes that he experienced stress specifically related to school. (Tr. 976-77, 980-81, 984-85, 988, 992). Additionally, on July 23, 2014, the plaintiff reported "[f]eeling better[,]" and that "Dr. T.[,]" who the plaintiff saw the day before (Tr. 996-97), "commented that he looked physically happier." (Tr. 994-95). On July 30, 2014, the plaintiff reported to Noyes that he completed hospice training and that he started to "socialize; will join friends at regular dinner parties, [s]till running[, and] [d]oing one video project[] about living with mental illness." (Tr. 992-93). At his August 2014 visit with Dr. Tirado-Montanez, the plaintiff continued to report a depressed mood associated with anhedonia and stress related to financial limitations and the denial of his SSDI application; his speech was normal, mood was depressed, and his thought process was goal oriented. (Tr. 986-87).

On September 16, 2014, Dr. Tirado-Montanez noted that the plaintiff "reported a partial improvement in his mood. He continue[d] with anhedonia[,]" he reported decreased quality of sleep and ruminations, and he recently returned to college and "reported difficulty coping with the requirements." (Tr. 1084-85). On September 24, 2014, Noyes referred him to group therapy for stress and pain management. (Tr. 1082-83). The plaintiff was seen on September 29, and on October 6 and 13, 2014, he said he was feeling depressed, physically tired, and "emotionally drained from the long term depression." (Tr. 1076-81). On October 14, 2014, the plaintiff reported to Dr. Tirado-Montanez that he had improvement in his sleep, and partial improvement in his

anhedonia. (Tr. 1074-75). He was taking two college courses and reported problems with concentration and attention. (Tr. 1074). The plaintiff continued to be seen by Noyes on October 20 and 22, 2014 (Tr. 1070-73), and on October 27, 2014, the plaintiff advised that he was considering writing a book. (Tr. 1068-69). He was "[s]miling, relieved, relaxed, [and] safe" from suicidal ideation. (Tr. 1068). Seven days later, he reported feeling depressed and tired. (Tr. 1066-67). On November 13, 2014, Dr. Tirado-Montanez also noted that the plaintiff continued to report a depressed mood, associated anhedonia, and financial stress. (Tr. 1062-63). The doctor noted that the plaintiff has "been engaged with supportive therapy." (Tr. 1062). The plaintiff's complaints continued at his next appointment with Noyes on November 19, 2014 (Tr. 1060-61), and the following week, Noyes noted that the plaintiff "held onto progress made [in the] last session." (Tr. 1058-59). On December 3, 2014, Noyes observed that the plaintiff looked "old" and "tired"; the plaintiff reported that his depression "has never been this bad." (Tr. 1056-57). He was seen December 8, and again two days later when he reported increased depression, lethargy, and suicidal ideation after the last session. (Tr. 1052-55).

On December 15, 2014, the plaintiff stated that he "want[ed] to get out of the funk of the past [year]." (Tr. 1152-53). Four days later, the plaintiff said that he signed up to volunteer at a horse therapy place. (Tr. 1150-51). In January, the plaintiff reported to Noyes that he visited his family for the holidays (1146-47); he continued to see Noyes on a weekly basis. (Tr. 1142-43, 1148-49). On January 13, 2015, the plaintiff told Dr. Tirado-Montanez he had a "partial improvement in his mood" and a "slight increase in energy." (Tr. 1144-45). On January 21, 2015, the plaintiff stated that he was starting school again, taking two courses. (Tr. 1140-41). A week later, he was anxious and depressed. (Tr. 1138-39). On February 4, 2015, he told Noyes that he was overwhelmed by a fear that he will not be successful in school. (Tr. 1136-37), and on February

18, 2015, he reported that school was difficult, "partly because of insufficient 'structure' outside of the class times." (Tr. 1132-33). A week later, the plaintiff reported that he had volunteered to assist a friend with a television production, which he thought would be an "acceptable 'out' from school." (Tr. 1130-31). However, upon reconsideration, he decided not to quit school. (Tr. 1130). On February 26, April 9, May 7, and June 4, 2015, Dr. Tirado-Montanez noted that the plaintiff was engaged in supportive therapy; the plaintiff reported depressed mood, associated anhedonia, and ruminations about financial limitations; the doctor found the plaintiff with a depressed mood, normal speech, circumstantial thought process, appropriate affect. (Tr. 1113-14, 1128-29, 1262-63, 1272-73). At his next appointment with Noyes, he was still debating quitting school (Tr. 1125-26), although later in March he talked about doing a presentation at school. (Tr. 1119-20). At his appointments in March and early April 2015, he reported stronger suicidal ideation, as well as difficulty sleeping due to medications. (Tr. 1115-18, 1121-24). Noyes assessed him as oriented, with a depressed mood and anxious affect, intact thought process, minimal impairment in judgment and insight, and no suicidal concern. (Tr. 1115, 1117, 1121, 1123).

On April 6 and 10, 2015, the plaintiff told Noyes that he had plans to do per diem work at his internship site and to travel to Pittsburgh to attend a wedding. (Tr. 1111, 1115). He continued to detail feelings of worthlessness and tiredness at his April 21 and May 8, 2015 appointments with Noyes. (Tr. 1270-71, 1274-75). In May, June, July and August, 2015, Noyes noted that the plaintiff's judgment and insight were minimally to moderately impaired. (*See, e.g.,* Tr. 1234, 1242, 1244, 1246, 1254-61, 1268-72). On May 27, 2015, Noyes noted that the plaintiff was neatly dressed (Tr. 1266-67), but five days later, and again on June 15, 2015, he appeared "[s]cruffy[,] unshaven, unkempt, but smiling." (Tr. 1258-59, 1264-65). The plaintiff reported that he was doing "good[.]" (Tr. 1264). Later in June, and in early July, Noyes noted that the plaintiff was

casually dressed in jeans and tee-shirt. (Tr. 1246, 1250). On June 10, 2015, he was "struggling with boredom[.]" (Tr. 1260-61). On June 22, 2015, he informed Noyes that he was trying to keep busy with a camping trip over the weekend, biking, and socializing with friends. (Tr. 1254-55). He was also thinking about not seeing his friends again because he felt suicidal. (Tr. 1254). A week later, he reported thoughts of suicide again. (Tr. 1252-53). On July 1, 2015, the plaintiff discussed whether it was worth it to get part-time work because "it might not be enough (financially)." (Tr. 1250-51). The next day, the plaintiff told Dr. Tirado-Montanez that he had a depressed mood and stress associated with relationships and financial limitations, and that he has been engaged with supportive therapy. (Tr. 1248-49). On July 15, 2015, the plaintiff told Noyes that he was "[s]till suicidal." (Tr. 1244-45).

On July 24, 2015, the plaintiff reported that he "[s]lipped' and drank last week after being sober since 2000[,]" and that he was "[o]ffered a per diem job as a recreation therapist [and he had] [d]oubts about whether or not he could handle it." (Tr. 1240-41). He was feeling suicidal. (Tr. 1240). Five days later, he still "[f]ault[ed] himself for leaving previous job, which would have been lucrative and meaningful[,]" and advised that he was training for a per diem job as a recreation therapist. (Tr. 1238-39). When he started the job, he expressed doubts that he could succeed. (Tr. 1234).

On August 6, 2015, Dr. Tirado-Montanez discussed with the plaintiff treatment options with an Intensive Outpatient Program. (Tr. 1236-37). At his August 18, 2015 appointment with Noyes, the plaintiff stated that he talked with his husband about his suicidal feelings (Tr. 1232-33), and, at his next appointment a week later, he reported that "[c]oming to therapy helps." (Tr. 1230; *see* Tr. 1229-31).

Noyes and Dr. Tirado-Montanez completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) on behalf of plaintiff in August 2015. (Tr. 1276-79). In this report, they noted that the plaintiff had "[m]arked" impairments in his ability to understand, remember and carry out short and simple, or detailed instructions, and had "[m]arked" impairments in his ability to make judgments on simple work-related decisions. (Tr. 1276). Additionally, they opined that the plaintiff has "poor tolerance to stress and frustration[]" and "capacity to reach decisions due to his depression and anxiety." (Tr. 1277). They rated the plaintiff with "[m]arked" impairments in his ability to interact appropriately with the public, respond appropriately to work pressures, and respond appropriately to changes in a routine work setting. (Tr. 1277). They found him "[m]oderate[ly]" impaired in his ability to interact with supervisors and co-workers. (Tr. 1277). Additionally, they concluded that he had "[m]arked" restrictions in his activities of daily living; "[m]arked" difficulties in social functioning; and frequent deficiencies in concentration, persistence or pace, with repeated episodes of decompensation. (Tr. 1277). Dr. Tirado-Montanez added that the plaintiff's then-current "clinical presentation [was] severe and not caused by substance abuse." (Tr. 1278).

C.   STATE AGENCY ASSESSMENTS

On February 28, 2014, Susan Uber, Ph.D., completed a Psychiatric Review Technique of the plaintiff in connection with his application for benefits in which she found that the plaintiff had mild restriction in activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and, one or two episodes of decompensation. (Tr. 106-07). In the Residual Functional Capacity Assessment, Dr. Uber concluded that the plaintiff was moderately limited in his ability to understand and remember detailed instructions as he struggled to multi-task, and his "performance anxiety interfere[d] with

memory as well, however, he [was] able to retain/comprehend simple work directives in a consistent and reliable fashion." (Tr. 108). She found him moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek. (Tr. 109). Similarly, she indicated that the plaintiff was moderately limited in his ability to interact appropriately with the general public, get along with coworkers and peers without distracting them, and maintain socially appropriate behavior. (Tr. 109). According to Dr. Uber, though the plaintiff was "capable of engaging in simple work activity[,]" his anxiety could "disrupt optimal performance and productivity[,]" and his anxiety "around multitasking [could] significantly disrupt complex work activity." (Tr. 109). He was "socially avoidant and therefore not best suited for work with the public[,]" and he could "distract and be distracted by peers due to anxiety and low frustration tolerance[,]" and could be "unkempt at times[.]" (Tr. 109).

Warren Leib, Ph.D., reached the same conclusions as Dr. Uber in his Psychiatric Review Technique, and in his Mental Residual Functional Capacity Assessment, both completed on July 9, 2014. (Tr. 125, 128-29). On August 4, 2014, Dr. Carol Honeychurch completed a Residual Functional Capacity Assessment of the plaintiff in which she concluded that he had to avoid concentrated exposure to noise as he was "unable to hear at a normal conversational level if there is noise in the background." (Tr. 126-27).

III.    THE ALJ'S DECISION

Following the five step evaluation process,[12] the ALJ found that the plaintiff's date last insured under the Social Security Act was December 31, 2016 (Tr. 47), and that he has not engaged in substantial gainful activity since January 1, 2014, his amended onset date. (Tr. 47, citing 20 C.F.R. § 404.1571 *et seq.*). The ALJ concluded that the plaintiff had the following severe impairments: bipolar disorder and ADHD (Tr. 47-48, citing 20 C.F.R. §§ 404.1520(c)), but that the plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 48-49, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). The ALJ found that, after careful consideration of the entire record, the plaintiff had the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels, but with the following nonexertional limitations: he was able to "perform simple, routine, and repetitive tasks and he [could] sustain concentration, persistence, or pace for two-hour segments[]"; he was "able to interact occasionally with coworkers but should have no interaction with the public[]"; the "work should include no more than simple work-related judgments[]"; and he could not "perform work requiring a specific production rate." (Tr. 49-53). The ALJ concluded that the plaintiff was unable to perform any past relevant work (Tr. 53, citing 20 C.F.R. § 404.1565), but he could perform work in the national economy. (Tr. 54, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Accordingly, the ALJ concluded that the plaintiff was not under a disability from January 1, 2014, the amended alleged onset date, through the date of his decision, which was October 27, 2015. (Tr. 54, citing 20 C.F.R. § 404.1520(g)).

---

[12] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed,

## IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993)

---

the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff contends that the ALJ erred in assigning little weight to the medical opinion of the plaintiff's treating physician, Dr. Tirado-Montanez, failed to properly consider the underlying treatment records from the Community Health Center, and failed to properly assess the records of the State of Connecticut Bureau of Rehabilitation Services which reflect that the plaintiff "experienced great psychological difficulty while attempting to work."   (Pl.'s Mem. at 10-19).  According to the plaintiff, these mistakes resulted in errors in the RFC findings that he was able to sustain concentration, persistence and pace for two-hour segments.  (Pl.'s Mem. at 20). Additionally, the plaintiff argues that the ALJ erred in his credibility finding as he failed to set forth with sufficient specificity why he found the plaintiff not fully credible.  (Pl.'s Mem. at 20-21).  Finally, the plaintiff maintains that the Appeal Council erred in not considering and crediting supplemental medical records from 2016 that the plaintiff submitted after the conclusion of the proceedings before the ALJ.  (Pl.'s Mem. at 22-24).

The defendant responds that the ALJ reasonably weighed the opinion evidence and incorporated significant limitations into his RFC finding.  (Def.'s Mem. at 16-23).  Additionally, the defendant counters that the ALJ's credibility assessment is entitled to deference and is not a ground for remand. (Def.'s Mem. at 22-25). Finally, the defendant argues that the evidence

submitted to the Appeals Council does not undermine the ALJ's decision because it relates to a time period after the relevant period at issue before the ALJ. (Def.'s Mem. at 25-27).

A.     THE ALJ'S RFC ASSESSMENT AND APPLICATION OF THE TREATING PHYSICIAN RULE WERE SUPPORTED BY SUBSTANTIAL EVIDENCE

As discussed above, the ALJ concluded that the plaintiff's bipolar disorder and ADHD are severe impairments that caused significant limitations on the plaintiff's ability to perform basic work activity. (Tr. 47-48). He then concluded, relying on the record, that the plaintiff had "mild" restriction in his daily living. (Tr.48). There are some entries in the record in which the plaintiff appeared "[s]cruffy; unshaven' [and] unkempt[,]" (Tr. 1258, 1264), but there are an equal number of entries where it was noted that he was clean, neat, and dressed well. (Tr. 807, 842, 862, 936, 1246, 1250). Additionally, as the ALJ acknowledged in his decision, although at times he lacked motivation, the plaintiff could groom and bathe himself, do yard work, laundry, and take out the trash. (Tr. 73). He also ran three to four miles a day (Tr. 73) and would get out of the house to go bicycling and do yoga as well. (Tr. 916, 1254).

The ALJ concluded that the plaintiff had moderate difficulties in social functioning, as the plaintiff tended to "isolate[,]" (Tr. 48; *see* Tr. 81 (the plaintiff testified that depression caused him to isolate socially)), but as the ALJ also noted, the record also reflects that the plaintiff socialized with friends and family. (Tr. 1146 (January 2015: the plaintiff reported to Noyes that he visited his family for the holidays); Tr. 992 (July 2014, the plaintiff started to "socialize; will join friends at regular dinner parties"); Tr. 1111, 1115 (April 2015: the plaintiff traveled to Pittsburgh to attend a wedding); Tr. 1254 (June 2015: reported to Noyes that he was trying to keep busy with a camping trip over the weekend, biking, and socializing with friends)).

Additionally, the ALJ's conclusion that the plaintiff had moderate difficulties with concentration, persistence or pace is supported by the record. (Tr. 48-49). The ALJ correctly

observed that the plaintiff functioned outside the home, even performing "work activity" (Tr. 48), including, as the plaintiff testified, checking his emails once a day. (Tr. 79). The plaintiff began utilizing the services offered at BRS on August 3, 2012. (Tr. 1154).[13] In March 2013, when the plaintiff began training, his performance was consistently rated good or excellent. (Tr. 1036-41). In May 2013, he was recommended to work at the Reliance House (Tr. 1039), and it was noted that he "demonstrate[d] excellent interpersonal skills" with "both membership and co-workers[,]" and he "foster[ed] the ability to gain trust through great listening skills, sincere comforting replies and positive encouraging thought or suggestions." (Tr. 1040). While he was serving as a paid intern at the Residence House in 2013, he went back to school to earn a certificate in recreation therapy. (Tr. 82). Records from BRS reflect that, in October 2013, his work and school schedule on Mondays and Tuesdays involved "15 hour days plus commuting home" (Tr. 1183); the plaintiff reported being overwhelmed and having increased depression from his work, school, his hearing while awaiting new hearing aids, and having to assist with the care of his sick mother. (Tr. 1180-84). The record also reflects that the plaintiff did complete a certification in recreation therapy from Manchester Community College in 2014 and took a limited number of courses each semester, although he did take one semester off. (Tr. 82-83, 1194). Additionally, in July 2014, the plaintiff completed hospice training so that he could serve as a volunteer. (Tr. 992). At the same time, he planned to do a "video project[] about living with mental illness." (Tr. 992). In a session on June 3, 2015 at BRS, the plaintiff mentioned that he would be attending a job interview for a recreation aide position, which was available both full time and per diem, and that he was also interested in working as a television producer like he had in the past (Tr. 1212). The month before, the plaintiff discussed that he completed school and was chosen for an award (Tr. 1210). Additionally, in

---

[13] AS discussed herein, the ALJ appropriately considered the records from BRS and the plaintiff's related vocational training and work history.

April 2015, he reported to Noyes that he had planned to do per diem work at his internship site. (Tr. 1111, 1115).

The plaintiff bears the burden of demonstrating that his functional limitations preclude any substantial gainful work. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382(a)(3)(H)(i); 20 C.F.R. §§ 404.1512(c), 416.912(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled. You must provide evidence, without redaction showing how your impairment(s) affects your functioning during the time you say you are disabled . . . ."); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity."); Social Security Ruling ["SSR"] 96-4p, 1996 WL 37187 at *2 (S.S.A. July 2, 1996). In this case, the plaintiff is correct, and the ALJ appropriately acknowledged, that his impairments affected his ability to perform work. (*See* Tr. 1074 (reported to Dr. Tirado-Montanez that he was taking two college courses and reported problems with concentration and attention; the doctor noted, however, "partial improvement" in the plaintiff's anhedonia at that time); Tr. 1084 (recently returned to college and "reported difficulty coping with the requirements[]"); Tr. 1154 (June 12, 2015 letter from Jennifer Bolay, a Vocational Rehabilitation Counselor: he "frequently reports significant difficulty with regulating mental health symptoms [which] has been observed during meetings at BRS and through discussions with his treatment providers[]"; he "[became] overwhelmed easily and [began] to display depressive symptoms" and his record documented "difficulty working and maintaining full-time employment and that he require[d] continuous mental health treatment in order to maintain employment.")). Indeed, after concluding that the plaintiff's bipolar disorder and ADHD were severe impairments, the ALJ found that the

plaintiff had several nonexertional limitations that impacted his ability to work. The plaintiff, however, did not establish that these limitations precluded him from performing *any* work.

In his RFC assessment, the ALJ included several nonexertional limitations to account for the plaintiff's impairments in functioning. Specifically, he found the plaintiff was able to "perform simple, routine, and repetitive tasks and he [could] sustain concentration, persistence, or pace for two-hour segments[]"; was "able to interact occasionally with coworkers but should have no interaction with the public[,]" could perform work that "include[d] no more than simple work-related judgments[]"; and could not "perform work requiring a specific production rate." (Tr. 49-53).

Dr. Susan Uber and Dr. Warren Leib, the State agency psychological consultants, found, based on the underlying medical records, that the plaintiff's ADHD symptoms left him struggling to multitask and that his performance anxiety interfered with his memory, but that he was capable of retaining and comprehending simple work directives in a consistent and reliable fashion and engaging in simple work activity with adequate concentration, persistence, and pace. (Tr. 108-09, 128-29). Additionally, they acknowledged that the plaintiff was socially avoidant and thus not best suited for work with the public and could distract and be distracted by peers due to his low frustration tolerance and anxiety (Tr. 108-09, 128-29).

The Second Circuit has recognized that "[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source." *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993). However, the opinions of non-examining sources may "override treating sources' opinions, provided they are supported by evidence in the record." *Id.* (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)). Thus, if the ALJ concludes that the opinion of non-examining source is entitled to greater weight

than the opinion of a treating physician, the ALJ must set forth "'good reasons' for not crediting the opinion" of the treating physician. *Burgess*, 537 F.3d at 129-30 (quoting *Snell,* 177 F.3d at 133); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error."). In this case, the ALJ did just that by explaining the inconsistency between the assessments of the treating providers and their underlying treatment records.

In his decision, the ALJ assigned "light weight" to the Medical Source Statements from Dr. Tirado-Montanez, the plaintiff's long-standing treating psychologist, on grounds that his findings "for marked limits in performing even short and simple instructions is not consistent with the content of the treatments notes[,]" noting that "there are no ongoing treatment notes that correspond to marked limits." (Tr. 52). *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d. Cir. 2009) (holding that the ALJ did not err in affording lesser weight to a treating physician's opinion when the underlying treatment notes do not support the conclusion reached by the treating physician); *see also Camille v. Colvin*, 652 F. App'x 25, 28 (2d. Cir. 2016) (summary order) (finding that the ALJ did not err in failing to apply in detail the "regulatory factors" to the treating physician's opinion when the court can "infer from the decision" the weight assigned to an opinion because of the consistency of the opinion with the record as a whole).

As the ALJ acknowledged, the "record does show that the [plaintiff] had a period of increased stress[,]"and the plaintiff required psychiatric inpatient treatment from December 28, 2013 to January 6, 2014, and intensive outpatient treatment from January 27 to March 11, 2014. (Tr. 51). But the record also showed a period of improvement, and the treatment notes from CHC "fail[ed] to show any significant loss of concentration/attention or any loss of cognitive ability

such that the claimant could not perform simple and routine tasks." (Tr. 51). Additionally, the record shows reports of suicidal ideation, but the treatment notes reflect that the plaintiff denied such ideations. (Tr. 51). Rather, even on the heels of the plaintiff's discharge from his inpatient stay at Lawrence & Memorial Hospital from December 28, 2013 to January 6, 2014, Noyes found the plaintiff's judgment and insight only moderately impaired. (Tr. 692, 730-31). And when the plaintiff expressed some suicidal ideations without plans, his providers opined that the plaintiff's judgment and insight were minimally to moderately impaired. (*See, e.g.*, Tr. 1234, 1242, 1244, 1246, 1254-61, 1268-72). At this very same time, the plaintiff reported his interest in pursuing work activities and career goals. For example, at his appointments in March and early April 2015, though he reported stronger suicidal ideation, as well as difficulty sleeping due to medications, (Tr. 1115-18, 1121-24), Noyes assessed him as oriented, with a depressed mood and anxious affect, intact thought process, minimal impairment in judgment and insight, and no suicidal concern. (Tr. 1115, 1117, 1121, 1123). Around the same time, the plaintiff reported to Noyes that he had plans to do per diem work at his internship site and to travel to Pittsburgh to attend a wedding. (Tr. 1111, 1115).

The plaintiff also showed improvement resulting from his PHP at Backus Hospital. Upon admission, his concentration and attention were rated as poor (Tr. 818, 853, 872), but treatment notes reflect improvement over the course of the program. (Tr. 803, 838, 858 (felt "significant improvement from the time that he had started the program[]"), 807, 842, 862 (neatly groomed, bright, articulate, "showing significant increase in spontaneity[]")). Additionally, when he was seen by Noyes on March 18, 2014, he was smiling and appeared more comfortable and relaxed. (Tr. 938-39). Two weeks later, he told Noyes that he was looking into Massage Therapy school; he was bowling and walking for recreation, and he was smiling and had a neat appearance. (Tr.

936-37).  Noyes's notes reflect the same positive improvement in April and May 2014, as well as the plaintiff's report that he was planning to volunteer at hospice.  (Tr. 924-27, 930-31, 934-35). Similarly, in July 2014, the plaintiff reported "[f]eeling better[,]" and that "Dr. T[irado]" "commented that he looked physically happier."  (Tr. 994-95).  At his August 2014 visit with Dr. Tirado-Montanez, the plaintiff continued to report a depressed mood associated with anhedonia and stress related to financial limitations and the denial of his SSDI application; Dr. Tirado-Montanez, however, continued to report that his speech was normal, mood was depressed, and thought process was goal oriented.  (Tr. 986-87).  Similarly, in September 2014, Dr. Tirado-Montanez noted that the plaintiff "reported a partial improvement in his mood."  (Tr. 1084-85). In October 2014, the plaintiff reported to Dr. Tirado-Montanez that he had improvement in his sleep and partial improvement in his anhedonia; he was taking two college courses. (Tr. 1074-75). Though he reported problems with concentration and attention (Tr. 1074), he told Noyes that he was considering writing a book. (Tr. 1068).  She noted that he was "[s]miling, relieved, relaxed, [and] safe" from suicidal ideation.  (Tr. 1068).

These contemporaneous records are not consistent with the June 30, 2014 assessment completed by Noyes and Dr. Tirado-Montanez. (Tr. 1048-51). In that assessment, Noyes noted "[s]light [i]mprovement" in the plaintiff's condition while noting the exacerbation of symptoms in the "winter 2013-14[.]"  (Tr. 1048). According to Noyes, the plaintiff had difficulty focusing and concentrating even with ADHD medications, and he had memory issues that "seem related to anxiety and [ADHD]."  (Tr. 1048).  At that point, his speech was normal, although Noyes noted it was "pressured at times over this past year[.]"(Tr. 1049).  She opined that he had a "mild impairment at present. Has been mild-moderately impaired at times over this past year."  (Tr. 1049).  She noted continuing suicidal ideation, "sense of overwhelm and anxiety. Sense of despair

has lessened since PHP treatment. Depression continues. Client tends to ruminate over stressors. Depression and anxiety lead to feelings of hopelessness [and] worthlessness." (Tr. 1049). She rated him as having a "[s]erious [p]roblem" using appropriate coping skills, handling frustration appropriately, carrying out multi-step instructions, and focusing long enough to finish assigned simple tasks. (Tr. 1049-50). She also rated him as having a "[s]erious" to "[v]ery [s]erious [p]roblem" performing basic work activities, and as having a "[s]erious [p]roblem" performing work activity on a sustained basis. (Tr. 1050).

The medical records from June 2014 through the August 2015 are largely consistent with the earlier records and likewise do not support the 2015 assessment completed by Dr. Tirado-Montanez and Noyes. Specifically, although the plaintiff continued to see these treating providers regularly and consistently reported feeling depressed (*see, e.g.*, Tr. 1052-55, 1060-63, 1066-67, 1076-81), the underlying records reflected that the plaintiff was "engaged with supportive therapy" (Tr. 1062), motivated "to get out of the funk of the [previous year (2014)]" (Tr. 1152), had signed up to volunteer at a horse therapy place (Tr. 1150), was visiting family and friends (Tr. 1111, 1115, 1146), and had returned to school to take two more courses. (Tr. 1140). On January 13, 2015, the plaintiff reported to Dr. Tirado-Montanez a "partial improvement in his mood" and a "slight increase in energy[]" (Tr. 1144-45), and although the plaintiff detailed stress related to school and considering quitting (*see* Tr. 1125), he completed his courses, did a presentation at school (Tr. 1119), and found school difficult "partly because of insufficient 'structure' outside of the class times[.]" (Tr. 1132). Dr. Tirado-Montanez consistently noted that the plaintiff reported depressed mood, associated anhedonia, and ruminations about financial limitations, but also that the plaintiff was engaged in supportive therapy, had normal speech, circumstantial thought process, an appropriate affect. (Tr. 1113-14, 1128-29, 1262-63, 1272-73). At his appointments in March and

early April 2015, when the plaintiff reported stronger suicidal ideation, as well as difficulty sleeping due to medications, Noyes assessed him as oriented, with a depressed mood and anxious affect, intact thought process, minimal impairment in judgment and insight, and no suicidal concern. (Tr. 1115, 1117, 1121, 1123).

Similarly, in May, June, July and August, 2015, Noyes noted that the plaintiff's judgment and insight were minimally to moderately impaired. (*See, e.g.,* Tr. 1234, 1242, 1244, 1246, 1254-61, 1268-72). When Noyes pointed out that the plaintiff, on two occasions, appeared "[s]cruffy; unshaven' [and] unkempt," she also wrote that he was "smiling[]" and that he said he was doing "good." (Tr. 1258-59, 1264-65). Around that same time, the plaintiff reported "struggling with boredom[,]" so he was trying to keep busy with a camping trip over the weekend, biking, and socializing with friends, although he also said he was thinking about not seeing these friends again because he felt suicidal. (Tr. 1254-55, 1260-61). Even with these reports of suicidal ideation, there was no change in treatment reflected in Dr. Tirado-Montanez's or Noyes's notes (*see, e.g.,* Tr. 1240, 1244-45, 1248-49), other than in August 2015, when Dr. Tirado-Montanez discussed with the plaintiff the option of an Intensive Outpatient Program, but there are no records showing that he ever actually referred him there. (Tr. 1236-37). In fact, one month before Dr. Tirado-Montanez and Noyes rated the plaintiff with such markedly severe impairments, the plaintiff reported that he was training for, and then started, a per diem job as a recreation therapist. (Tr. 1234, 1238-39).

The ALJ was correct that the foregoing records do not support Noyes and Dr. Tirado-Montanez 2015 assessment (Tr. 1276-79) in which they noted "[m]arked" impairments in the plaintiff's ability to understand, remember and carry out short and simple, or detailed instructions; "[m]arked" impairments in his ability to make judgments on simple work-related decisions; "[m]arked" impairments in his ability to interact appropriately with the public, respond

appropriately to work pressures, and respond appropriately to changes in a routine work setting; "[m]arked" restrictions in his activities of daily living; marked difficulties in social functioning; and frequent deficiencies in concentration, persistence or pace, with repeated episodes of decompensation. (Tr. 1276-77).

Contrary to the plaintiff's contention, the ALJ did not "cherry pick[]" the record and substitute his opinion for medical opinions in the record. (Pl.'s Mem. at 13, 17). The ALJ acknowledged that the plaintiff had severe impairments, identified the limitations that resulted therefrom, and appropriately detailed what the plaintiff could do despite his impairments. Moreover, the treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]); *see* 20 C.F.R. § 416.927(c)(2). The ALJ is correct that the substance of Dr. Tirado-Montanez and Noyes's findings was not supported by their underlying treatment records or by the plaintiff's own reported work and activities. *See Poupore*, 566 F.3d at 306 (holding that the ALJ did not err in affording lesser weight to a treating physician's opinion when the underlying treatment notes do not support the conclusion reached by the treating physician). The ALJ did not err, and his decision, as discussed above, is supported by substantial evidence. *See Hanson v. Comm'r of Soc. Sec.*, No. 3:15 CV 150(GTS)(WBC), 2016 WL 3960486, at *12 (N.D.N.Y. June 29, 2016) ("Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence . . . Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence

in record."), *report and recommendation adopted sub nom. Hanson v. Colvin*, No. 3:15 CV 150(GTS)(WBC), 2016 WL 3951150 (N.D.N.Y. July 20, 2016).

B.  THE ALJ DID NOT ERR IN HIS CREDIBILITY FINDING

In his decision, the ALJ concluded that although the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not entirely credible[.]" (Tr. 50). He added: "The claimant's subjective symptoms lack credibility to the extent that they purport to describe a condition of disability for Social Security purposes." (Tr. 53). The plaintiff contends that the ALJ "failed to set forth his findings as to why he found the plaintiff not fully credible with sufficient specificity as required." (Pl.'s Mem. at 21). The plaintiff, however, sets forth no evidence to counter the ALJ's conclusion.

As discussed above, the ALJ noted in his decision (*see* Tr. 50-51), based on the plaintiff's hearing testimony, and the underlying medical record, that the plaintiff could groom and bathe himself, do yard work and laundry, take out the trash, check emails, and exercise regularly. (Tr. 73, 79). Additionally, the ALJ appropriately considered that, although the plaintiff reported problems with concentration and suicidal thoughts, he continued to work on a per diem basis. (Tr. 50). Moreover, the ALJ accounted for the plaintiff's social limitations in his RFC assessment. (Tr. 51).

"It is the role of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). However, before concluding that the claimant is "not a credible reporter of his own limitations, the ALJ [must]

consider all of the evidence of the record, including [the claimant's testimony] and other statements with respect to his daily activities." *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)); *see also* SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996)[14] ("In determining the credibility if the individual's statements, the adjudicator must consider the entire case record, including . . . statements and other information provided by treating or examining physicians or psychologists  . . . ."). The ALJ's decision is subject to deference as long as he provides specific reasons for his determination, and the "record evidence permits [the Court] to glean the rationale of the ALJ's decision[.]" *Cichocki*, 534 F. App'x at 76.

Because "[c]redibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are 'patently unreasonable[,]'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997), this Court cannot conclude that the ALJ's decision was patently unreasonable in light of the medical record the ALJ reviewed. As discussed above, the ALJ adequately explained his reasons for reaching his conclusion regarding the severity of the plaintiff's impairments and the limitations resulting therefrom. Moreover, the ALJ did not err when discrediting the plaintiff's subjective assessments after he reviewed the medical testimony, the plaintiff's demeanor, and the objective medical evidence. *See Tejada v. Apfel*, 167 F.3d 770, 775-76 (2d Cir. 1999); *Scott v. Berryhill*, No. 3:17 CV 211(JAM), 2018 WL 1608807, at * (D. Conn. Mar. 31, 2018). Accordingly, this Court concludes that the ALJ's credibility determination is supported by substantial evidence.

---

[14] SSR 96-7p was rescinded and superseded by SSR 16-3p on October 25, 2017. SSR 16-3p, 2017 WL 5180304, at *1 (S.S.A. Oct. 25, 2017). As stated in SSR 16-3p, ALJs apply 16-3p in decisions made on or after March 28, 2016, and "[w]hen a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review." *Id.* The decision was issued in this case on October 27, 2015; accordingly, SSR 96-7p applies.

C.    THE APPEALS COUNCIL DID NOT ERR IN REFUSING TO CONSIDER NEWLY SUBMITTED 2016 MEDICAL RECORDS

As discussed above, the ALJ's decision was issued in this case on October 27, 2015.  (Tr. 42-62).  Following the decision, the plaintiff submitted to the Appeals Council several hospital records from an admission from May 23-May 24, 2016 for suicidal ideations and depression following episodes of drinking and failing to take his psychiatric medications (Tr. 9-26), and an admission from November 16-30, 2016 for a "[b]rief [p]sychotic [d]isorder[.]" (Tr. 27-40).

While "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision[,]"  *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996), the Appeals Council will consider the new evidence only if it is "material, . . . related to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. § 404.970(a)(5).

In this case, the Appeals Council appropriately concluded that it could not consider the hospital records from May and November 2016 as they "do not relate to the period [of alleged disability] at issue," which was January 1, 2014 through October 27, 2015.  (Tr. 2). Thus, while the records reflect severe symptoms at the time of each hospitalization, the Appeals Council appropriately concluded that the 2016 records "[do] not affect the decision about whether [the plaintiff was] disabled beginning on or before October 27, 2015."  (Tr. 2).

VI.    <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 22) is *denied*, and the defendant's Motion to Affirm (Doc. No. 23) is *granted.*

Dated this 26th day of September, 2018 at New Haven, Connecticut.

　/s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge